## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

C.S. by her Next Friend,
ADAM STROUB,

      Case No. 4:22-cv-10993-TGB-EAS
      Hon. Terrence E. Berg

    Plaintiff,

      Magistrate Judge
        Elizabeth A. Stafford

v.

CRAIG MCCRUMB et al.,

    Defendants.
_____/

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................1

INDEX OF AUTHORITIES............................................................2

Counter-Statement of Material Facts.........................................3

Argument......................................................................................5

   I.  A. Pertinent Legal Principles. ..............................................5

      B. The Law Applied to this Case ......................................18

    Defendants' Dress Code and Application Thereof Were Arbitrary..22

    Defendants are not Entitled to Qualified Immunity........................23

Conclusion ................................................................................24

## INDEX OF AUTHORITIES

**Cases**

*Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).21

*Barr v. Lafon,* 538 F.3d 554, 564 (6th Cir. 2008)....................................2, 9

*Bethel School District v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed. 2d 549 (1986) ...............................................................2, 6, 8

*Defoe v. Spiva,* 625 F.3d 324 (6th Cir. 2010).............................2, 8, 11, 16

*Exec. Ambulatory Surgical Ctr., LLC v. Allstate Fire & Cas. Ins. Co.*, 2022 U.S. Dist. LEXIS 224415, \*\*10-11 (E.D. Mich. Dec. 13, 2022) ...........21

*Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ........................................................ passim

*Mahanoy Area Sch. Dist. v. B.L.,* 594 U.S. ___, 141 S.Ct. 2038, 210 L.Ed.2d 403 (2021) ...............................................................3, 7

*Morrison v. Bd. of Trustees of Green Twp.,* 583 F.3d 394, 400 (6th Cir. 2009) .........................................................................24

*Morse v. Frederick,* 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) ...............................................................................3, 7, 8

*N.J. v. Sonnabend,* 37 F.4th 412 (7th Cir. 2022) ............................3, 10, 11

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020) ...............................................................................3, 11

*Nuxoll v. Indian Prairie School District # 204,* 523 F.3d 668 (7th Cir. 2008) ...............................................................................3, 9, 11

*Schoenecker v. Koopman,* 349 F. Supp. 3d 745 (E.D. Wis. 2018), 3, 15, 16

*See Spence v. State of Washington,* 418 U.S. 405, 411, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) ...............................................................3, 17

*Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) ...............................................................................3, 17

*Supreme Court of Virginia v. Consumers Union of United States, Inc.,* 446 U.S. 719, 734-37 (1980) .........................................................25

*Terminiello* v. *Chicago,* 337 U.S. 1 (1949) ............................................14

*Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ......................................................... passim

*West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943)............................................3, 17

*Zamecnik v. Indian Prairie School District # 204,* 636 F.3d 874 (7th Cir. 2011) ...............................................................................3, 9, 11

**Counter-Statement of Material Facts**

Defendants' failure to comply with the Court's "Practice Guidelines" for summary-judgment motions makes the job of both Plaintiff and this Court more difficult. Defendants did not include a "Statement of Material Facts" consisting of separate, numbered paragraphs each briefly describing a material fact underlying the motion and citing to record evidence. Instead they offer a "separate narrative facts section" the Guidelines expressly prohibit. Nevertheless, Plaintiff will respond by identifying the facts by page and description in this Counter-statement.

1. Plaintiff does not dispute the facts on pp. 4-6 of Defendants' Brief.

2. Plaintiff does not dispute the facts in the first four sentences in the first paragraph on p. 7 of Defendants' Brief.

3. For the fifth sentence in the first paragraph on p. 7, Plaintiff admits that Ms. Leffel testified she believed the Hat was threatening and may incite an altercation, but the citation provided by Plaintiff does not show that Ms. Leffel thought it was provocative, or might incite a disruption to the educational environment. Those words do not appear on the page of Ms. Leffel's

deposition Defendants cite. Indeed, though their brief repeatedly uses the word "provocative," Ms. Leffel in testifying never used that word. ECF 17-4, PID # 348.

4.  For the last (sixth) sentence in the first paragraph of p. 7 of Defendants' Brief, Plaintiff denies that the source cited by Defendants shows that Ms. Leffel believed the Hat was against school dress code – she said it was her own discretion that made the Hat problematic.  Def. Exhibit 3, p. 16, ECF 17-4, PID # 342.

5.  For the first sentence in the second paragraph on p. 7 of Defendants' Brief, Plaintiff denies that Ms. Leffel testified that students moved from Oxford after a school shooting on November 30, 2021.  Leffel testified that students moved to Durand from Oxford, but did not testify the moves were before or after the shooting.  Def. Exhibit 3, p. 24, ECF 17-4, PID # 344.

6.  For the sentence that begins on p. 7 and ends at the top of p. 8, Plaintiff denies that Ms. Leffel believed the Hat might impact students' rights to a free and appropriate public education. She ***never*** mentioned a free and appropriate public education and did not mention Oxford until after she said students might be afraid

of the Hat.  Def. Exhibit 3, p. 23, ECF 17-4, PID # 344.

7.  Plaintiff does not dispute the full sentences on p. 8 and continuing onto p. 9 of Defendant's Brief.

Additional facts:

1.   C.S. enjoys shooting rifles with her father.  Decl. of C.S. ¶ 5.

2.  She chose the Hat to wear on hat day both because it is her father's and makes her feel safe and because it shows support for people's right to have guns.  Decl. of C.S., ¶ 6.

3.  C.S. has attended a Second Amendment rally years before hat day. Doc. 17-3, p. 7, PID # 327 (Deposition p. 24).

## <u>Argument</u>

## I.
## A.   **Pertinent legal principles.**

*Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), discussed extensively in Plaintiff's motion, controls here. It held that student speech may be suppressed only where there is a finding and showing "that engaging in the forbidden conduct would 'materially and  substantially interfere with the requirements of appropriate discipline in the operation of the

school….” *Id.* at 509 (citation omitted). Defendants do not come close to making that showing.

Since *Tinker,* the Supreme Court has further refined First Amendment jurisprudence in public schools. In *Bethel School District v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed. 2d 549 (1986), the Court considered indecent, lewd, and vulgar remarks made by a student during a school assembly on school grounds, and determined that *Tinker* does not extend to such speech.

In *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), a student wrote an article about teen pregnancy in the school newspaper, and, with their permission, named girls in the school who had become pregnant. The Supreme Court ruled that something appearing in the school paper, even though primarily student-written, bore the school's imprimatur and people might perceive it to be school-sponsored speech, thus the school could censor it.

In *Morse v. Frederick,* 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), a school disciplined a student for displaying a banner at a school activity that read "BONG HITS 4 JESUS." The Court ruled that public schools may censor speech that promotes illegal drug use.

Those rulings notwithstanding, *Tinker*'s central holding remains good law. In *Mahanoy Area Sch. Dist. v. B.L.,* 594 U.S. ___, 141 S.Ct. 2038, 210 L.Ed.2d 403 (2021), the Court recently reiterated that students "do not shed their constitutional rights to freedom of speech or expression even at the school house gate."  The Court reminded:

> [There are T]hree specific categories of student speech that schools may regulate in certain circumstances:  (1) indecent, lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper.

Thus, if the circumstances of *Bethel, Hazelwood,* or *Morse* are not present, it is a *Tinker* case.

The 6th Circuit has considered several public school First Amendment cases, with one of the more thorough discussions being *Defoe v. Spiva,* 625 F.3d 324 (6th Cir. 2010). *Defoe* recounted the history of *Tinker, Bethel,* and *Hazelwood* (the *Defoe* case does not mention *Morse*, but the present case clearly has nothing to do with illegal drug use). *Defoe* observed that the *Tinker-Bethel-Hazelwood* trilogy "yields three principles."  625 F.3d at 332.  Those principles are 1) under *Bethel* a school may categorically prohibit vulgar, lewd, indecent or plainly

offensive speech; 2) under *Hazelwood* a school has limited authority to censor school sponsored speech in a manner consistent with pedagogical concerns; and 3) the *Tinker* standard applies to all other student speech and allows regulation "***only*** when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline." *Id.* (emphasis added). *Defoe* applied those principles and held that a student wearing clothing with the image of the Confederate flag is "pure speech" and *Bethel* and *Hazelwood* do not apply. *Id.* The Court concluded that *Tinker* governs in such cases, and "the inquiry in this case focuses on whether the record demonstrates any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.; see also Barr v. Lafon,* 538 F.3d 554, 564 (6th Cir. 2008) ("*Tinker* governs… because by wearing clothing depicting images of the Confederate flag students engage in pure speech not sponsored by the school").

The 7th Circuit has taken a similar approach.  In *Nuxoll v. Indian Prairie School District # 204,* 523 F.3d 668 (7th Cir. 2008), the Court applied the *Tinker* test to a T-shirt that said, "be happy, not gay."  The Court affirmed an injunction and damages against the school for

banning the shirt, finding that the shirt had only a "speculative … slight tendency to provoke [harassment of homosexual students.]" 523 F.3d at 676. The case went back to the 7th Circuit to consider a permanent injunction as *Zamecnik v. Indian Prairie School District # 204,* 636 F.3d 874 (7th Cir. 2011). In *Zamecnik,* the Court said the school could censor the shirt only where it "might reasonably lead school officials to forecast substantial disruption. Such facts might include a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school…." 636 F.3d at 876.

More recently and even more on point, in *N.J. v. Sonnabend,* 37 F.4th 412 (7th Cir. 2022), the Seventh Circuit considered a case where high-school officials told a student he could not wear a T-shirt depicting a handgun. The Court said, "*Tinker* provides the legal standard: restrictions on student speech are constitutionally permissible if school officials reasonably forecast that the speech would materially and substantially disrupt the work and discipline of the school or invade the rights of others." 37 F.4th at 416.

As in this case, the *N.J.* principal said clothing depicting firearms was "inappropriate." *Id.* at 421. But the 7th Circuit noted, "[a]n

undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 423, *quoting Tinker*, 393 U.S. at 508. The Court remanded the case and emphasized, "school officials must present facts that might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities or the invasion of the rights of others." *Id.* at 426. "[M]ere speculation won't do." *Id.* (citation omitted). "Rather, school officials must present facts that might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.* (cleaned up), citing *Tinker*, 393 U.S. at 514 and *Nuxoll*, 523 F.3d at 673. "It's an objective inquiry, and *Tinker* places the burden of justifying student-speech restrictions squarely on school officials." *Id.*, citing *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020) (collecting cases).

## B.   The law applied to this case.

The Hat in the present case is like the armbands in *Tinker* and the T-shirts in *Defoe, Nuxoll-Zamecnik,* and *N.J.* Under *Tinker*, the Hat is protected speech unless Defendants present facts that might reasonably have led them to forecast substantial disruption of or material

interference with school authorities or the invasion of the rights of others. It is not enough for Defendants to have a mere desire to avoid the discomfort or unpleasantness that always accompany an unpopular viewpoint, or an undifferentiated fear or apprehension of disturbance.

Defendants have failed to present any such facts.  Leffel testified that students were not to wear hats with "vulgar wording, inappropriate pictures, logos not appropriate for school."  Leffel Depo., p. 8, ll. 5-7. She said C.S.'s Hat was not allowed "because it was a weapon and we were in a school setting, that it was not appropriate." *Id.,* p. 10, ll. 22-23. Her explanation of why the Hat was not appropriate was, "Well, it has a weapon on it, and the phrase, 'Come and take it.' I took that as threatening." *Id.,* p. 15, ll. 1-2. By way of elaboration, Leffel said, "The phrase itself seems like it's trying to incite someone to come and have an altercation to take a weapon." *Id.,* ll. 4-5. She admitted, however, that she did not believe C.S. actually had a weapon at school.  *Id.,* ll. 6-11.

Leffel continued, "[W]e're in an elementary school setting and it is a gun-free zone. And I didn't feel that any type of weapons are appropriate in the school setting or anything that suggests violence. Guns often suggest violence.  And so that was my reasoning." *Id.,* p. 16,

ll. 1-5.  Later, she deposed, "Yeah, I – from my own perspective … I feel there is no appropriate pictures of weapons that would be appropriate in the school setting at any time." *Id.,* p. 22, ll. 1-3.

The extent of the disruption Leffel forecasted was minimal:

Q:  Did you think that the image of a rifle on the hat would cause any kind of disruption in the school?
A:  I felt it could, yes.
Q:  And kind of disruption did you think it would cause?
A:  Fear.
Q:  Fear among?
A:  Students.
…
Q: Any other kind of disruption you thought might occur other than fear among students?
A:  I felt staff would be very uncomfortable with it as well.
Q:  And how did you think that discomfort would manifest itself?
A:  Well, they would communicate to me that that was – if it wasn't addressed, I know staff would have reached out to notify me that we had a student wearing that and it did not fall within our dress code policy.
…
Q:  [I]s there any other way that you thought that allowing C.S. to wear the hat would cause a disruption?
A:  Other than inciting fear?
Q:  Yes.
A:  I can't speak for what might have happened.
Q:  the phrase "Come and take it," did you think that that might cause a disruption?
A:  Possibly.
Q:  And what kind of disruption did you think it might cause?
A:  Again, I would only theorizing [sic] about what could have

happened.  But we have young – young kids who can be very impetuous and could perceive that as a dare to try and take the hat off her. [*Id.,* pp. 23-25].

What Leffel described, of course, is merely a generalized desire to avoid unpleasantness and an undifferentiated fear – exactly what *Tinker* instructs is ***not*** a valid basis for censoring speech. She admits that she is only speculating on what might have happened. She does not actually have any facts to support a reasonable forecast; she only guessed. Ms. Leffel also admitted that at the time she was not making any forecasts or even theorizing. *Id.,* p. 26 ("If I sat down and thought through the whole – again, at that moment, I wasn't theorizing.  I was looking at what was in front of me.")

And *Tinker* itself forecloses any reliance on a supposed fear that another student actually would "come and take" the Hat:

> Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello* v. *Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom -- this kind of openness -- that is the basis of our national strength and of the independence and vigor of Americans  who grow up and live in this relatively permissive, often disputatious, society. [393 U.S. at 508-509].

Because Defendants are unable to substantiate a forecast, the *Tinker*

standard requires ruling in favor of C.S.

Leffel also deposed that some RKES students had previously been in the Oxford school district, which experienced a school shooting. Doc. 17-4, p. 24. She said she had conversations with those students' parents, and some students were receiving counseling and social work support. *Id.* That is, some students had concerns about the shooting ***at Oxford***, and for that reason Leffel "didn't feel [the Hat] was appropriate." *Id.*

A nearly identical argument has been considered and rejected. In *Schoenecker v. Koopman,* 349 F. Supp. 3d 745 (E.D. Wis. 2018), a student was disciplined for wearing T-shirts to school that depicted various firearms and other weapons. 349 F.Supp. 3d at 747. The shirts made some teachers "uncomfortable and concerned about school safety, especially because the [student] wore the shirts shortly after the shooting at Marjory Stoneman Douglas High School in Parkland, Florida." *Id*. at 752-753. The Court enjoined the school officials:

> As far as the record reveals, no students felt threatened by the plaintiff's shirts. Yes, some students were concerned about school shootings in general, but no evidence suggests that the plaintiff's shirts contributed to any student's anxiety. ***The evidence is that the actual school shooting in Parkland, Florida was what prompted the students' concerns***. The defendant tells us that the plaintiff's shirts made some staff members uncomfortable and concerned about school safety,

14

but there is no evidence that any staff member's ability to provide instruction to students was affected.  Moreover, the staff members' reaction to the shirts seems unreasonable, as none of the shirts promote gun violence. [*Id.* at 753 (emphasis supplied)].

Here, Leffel's comment was that some students were concerned about an ***actual*** school shooting in Oxford. She testified that ***no*** students expressed concern about C.S.'s Hat. Leffel Depo., p. 23. And, like the T-shirts in *Schoenecker,* C.S.'s Hat bore an image of a rifle in a non-violent manner, without promotion of gun violence.[1]

C.S. of course understands that every individual will react differently to images of firearms; she is further cognizant of the Court's own tragic experience. But the standard for restricting pure speech in school is not what the most sensitive student (or school employee) feels uncomfortable with. Rather, the inquiry "focuses on whether the record demonstrates any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference

---

[1]  As discussed in Plaintiff's brief supporting her summary-judgment motion, pp. 22-25, Leffel deposed that no weapons could ever be depicted on any clothing at any time for any reason. Doc. 17-4, p. 27, ll. 2-9. Her interpretation would bar even a hat depicting the Michigan state seal or the Michigan state flag. And it would – and did – ban a symbol with a historic pedigree dating to the 19th Century, at least. *Id.*

with school activities." *Defoe,* 625 F.3d at 332. C.S.'s use of the symbol on the Hat she wore to school is nothing more than her showing support for the Constitution and the Second Amendment. The First Amendment protects her right to express her support for the Second Amendment, where there is absolutely no evidence of disruption or interference beyond administrators' own viewpoint-based conjecture.

Defendants also argue that the Hat is not pure speech, making a perfunctory argument that it is expression, to which should apply an expression standard (likelihood the message would be understood by those who viewed it). *See Spence v. State of Washington,* 418 U.S. 405, 411, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). But *Spence* dealt with "expression of an idea through activity." *Id.* In *Spence,* the activity was using black tape to place a peace symbol on an American flag. This is in contrast to a flag itself, which "in many of their uses are a form of symbolism comprising a primitive but effective way of communicating ideas and a short cut from mind to mind." *Spence,* 418 U.S. at 410, *citing Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) and *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943).

In *Spence* the Court noted, "there can be little doubt that appellant communicated through the use of symbols. The symbolism included not only the flag but also the superimposed peace symbol." *Id.* Likewise, C.S. wore a hat that depicted the Gonzalez flag, modernized to depict a breech-loading rifle rather than a muzzle loading cannon. As noted above, the use of a rifle in place of a cannon on the Gonzalez flag is about 30 years old. The fact that Defendants, educators all, are unfamiliar with the Gonzalez flag and the history of the words "come and take it" is of no import. C.S. wore the Hat, which contains actual words combined with symbols of historical significance. As in *Spence,* "there can be little doubt that [C.S.] communicated through the use of symbols."

Defendants also rely on C.S.'s deposition, where they asked her why she picked the Hat and she said "[b]ecause it made me feel safe." Doc. 17-1, p. 10. On follow-up, they asked if it made her feel safe because it was her dad's, and she said "yes." *Id.* However, Defendants never asked if there were other reasons she wore the Hat, or even other reasons why it made her feel safe – such as because of the protections of the Second Amendment, or the Second Amendment activities she has

engaged in with her father. Instead, Defendants suggest but one reason, one that fit their narrative, and stop.  Their failure to close the loop on that line of questioning was done at their own peril. C.S. now declares that in addition to it being her father's Hat, she likes it because it symbolizes support for gun rights.  Decl. of C.S., ¶ 6.

Defendants also argue that C.S. did not testify that she enjoys "shooting, hunting, or any other activity involving firearms." Brief, p. 10. Defendants do not articulate the significance of this, though they know that C.S. has engaged in sport shooting and has participated in Second Amendment rallies. Undisputed evidence – exhibits to Adam Stroub's Deposition – include photos of C.S. shooting rifles with her father and pictures of her at a 2019 Second Amendment rally at the Capitol in Lansing wearing a replica rifle and holding a Gadsden flag:





Doc 17-3, p. 24 (While both C.S. and Defendants filed the Deposition of

Adam Stroub, both sides neglected to file the exhibits to that deposition.

C.S. is filing them now, as an exhibit to this Brief.)[2]

In addition, C.S. declares that she enjoys shooting rifles with her

father. Decl of C.S., ¶ 5. Of course, it is not necessary that C.S. have any

interest in sport shooting or Second Amendment rallies to wear a Hat

---

[2] The Gadsden flag is from the American Revolution, and depicts a rattlesnake with the words "Don't tread on me" beneath. It was used as a political symbol and as a warning to the British not to violate Americans' liberties, and the associated segmented snake traces to Ben Franklin's "join or die" admonition for the colonies to unite in the French and Indian War. https://en.wikipedia.org/wiki/Gadsden_flag (last viewed May 15, 2023). It "quickly became popular among the American public," *Id*, citing Daniel J. McDonough, *Christopher Gadsden and Henry Laurens: The Parallel Lives of Two American Patriots* (Susquehanna Univ. Press 2000), and in prior generations – though evidently not today, in Durand – routinely was taught to the nation's schoolchildren.

that shows support for the Second Amendment – but the undisputed record evidence shows that she does.[3]

---

[3] This Court may consider C.S.'s Declaration because it in no way contradicts her deposition testimony, but rather fills in gaps in Defendants' questioning of her. As noted above, after defendants asked why she chose the Hat and elicited the answer "because it made me feel safe," counsel's sole followup question was a leading one as to *why* it made her feel safe. ("Q. Okay. Is that because it's your dad's hat? A. Yes. Q. You want to be cool like your dad; right? A. Yes.") Doc. 17-1, p. 10. Counsel never asked C.S. if there was any other reason why she chose the Hat. *See Exec. Ambulatory Surgical Ctr., LLC v. Allstate Fire & Cas. Ins. Co.*, 2022 U.S. Dist. LEXIS 224415, \*\*10-11 (E.D. Mich. Dec. 13, 2022) (court considered portion of Plaintiff's affidavit discussing the use of CPT codes "because it fills a gap in his deposition testimony, responds to an argument raised in Allstate's Motion, and does not contradict prior testimony"); *accord Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (post-deposition affidavit that does not "directly contradict" deposition testimony must be considered unless court determines it constitutes an attempt to create a sham fact issue).

The Sixth Circuit in *Aerel* said the "sham" inquiry may be informed by a nonexhaustive list of factors including "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." 448 F.3d at 908-909 (citation omitted). Those factors all cut in favor of C.S.: she was not asked if there were any other reasons why she chose the Hat nor cross-examined, and her support for the Second Amendment and shooting sports is not a "sham" – photos *dating to 2019* show her engaging in numerous such activities, and in fact were in Defendants' possession when they took her deposition.

_Tinker_, not _Hazelwood_, Governs this Case Because the Hat was not School-Sponsored Speech.

Defendants next argue that C.S.'s wearing of the Hat was somehow school-sponsored, bringing it within _Hazelwood's_ ambit. Brief, pp 9-15. Defendants are incorrect. As noted above, _Hazelwood_ applies when students, parents, and members of the public might reasonably perceive the speech to bear the imprimatur of the school. The speech must be supervised by faculty and designed to impart particular knowledge or skills to students, like the school newspaper in that case. 484 U.S. at 271.

Defendants' only argument that the Hat was school-sponsored is that the school "sponsored" a "hat day," on which students were encouraged to wear hats **_of their own choosing._** According to Defendants' own communications, students were to "dress up – wear a hat day." Doc. 17-9, p. 1. Defendant Leffel described the range of permissible hats as "anything that doesn't have, you know, vulgar wording, inappropriate pictures, logos not appropriate for school." Doc. 17-4, p. 3 (deposition page 8). She deposed that the hats could be anything consistent with the dress code. _Id._ That is, she did not impose any greater restrictions, such as to include "legitimate pedagogical concerns." She viewed it as just another article of student clothing. On a day where the

school urged students to choose their own hat to wear, it is simply unreasonable for anyone to view the school as endorsing the hundreds of individual messages on the hats that were worn.

Moreover, there is nothing in the record indicating that the wearing of hats imparted a particular knowledge or skill, or that it was supervised by faculty, at least not to any greater degree than any other student clothing. Because hat day bore none of the indicia of school-sponsored speech, *Tinker*, not *Hazelwood*, provides the appropriate standard.

## Defendants' Dress Code and Application Thereof Were Arbitrary

Defendant Leffel testified that she had discretion as to what is or is not appropriate in school.  Doc. 15-2, p. 98. She admitted that until "hat day," there had been no discussion about the appropriateness of students wearing clothing depicting weapons. *Id.,* p. 99.  The issue had never come up before. *Id.,* p. 102. Moreover, the dress code in effect at the time did not address clothing that depicts weapons. The words "weapon" or "gun" or "firearm" are nowhere to be found in it.  Doc. 17-5, p. 14.

Because students' wearing clothing that depict weapons had never come up, and because the dress code did not say that clothing depicting weapons or firearms was no allowed, Defendants had not put C.S. on

notice that wearing the Hat would be a violation. Instead, the disallowance of the Hat was arbitrary and made on the spot.

Defendants are not Entitled to Qualified Immunity

Defendants argue that they are entitled to qualified immunity. A government official exercising discretion is entitled to qualified immunity *from damages* unless the official violates the plaintiff's constitutional rights and the law was clearly established or a reasonable person would have known. *Morrison v. Bd. of Trustees of Green Twp.,* 583 F.3d 394, 400 (6th Cir. 2009) (emphasis added).

As shown above, Defendants violated C.S.'s constitutional free-speech rights. They are therefore not entitled to qualified immunity (from damages) if the law at issue was clearly established or Defendants reasonably should have known about it. In the present case, *Tinker* and subsequent 6th Circuit cases show that the law is clearly established. A public-school student cannot be prevented from wearing clothing that contains pure speech absent one of the exceptions already discussed. And Defendants were aware of that law, because they (unsuccessfully) tried to characterize their actions as motivated by a fear of the Hat disrupting the educational environment. Because no *Tinker* exception

exists, the law is clearly established and there is no qualified immunity.

Even if there is qualified immunity, it only protects Defendants from damages, not from declaratory and injunctive relief. *Supreme Court of Virginia v. Consumers Union of United States, Inc.,* 446 U.S. 719, 734-37 (1980). C.S. has sought declaratory, injunctive, and nominal damages relief.  Doc. 1, ¶¶ 49-51. Thus, at most, qualified immunity would foreclose the recovery of nominal damages. It would have no effect on the recovery of declaratory and injunctive relief.

## Conclusion

Defendants held a "Hat Day," and encouraged students to wear a hat of their choosing. But they disapproved of the message on C.S.'s hat, and made her remove it. On this record, a jury could reasonably conclude that the reasons they gave – speculation and conjecture about feared "disruption" – are pretextual, and that the real reason for their action was their disapproval of the Hat's pro-gun message and/or their view of firearms as antithetical to "kindness." *Tinker* for more than 50 years has made clear that the First Amendment does not countenance such viewpoint-based message suppression. Defendants are entitled to neither summary judgment nor qualified immunity.

Respectfully submitted on May 15, 2023 by:

/s/ John R. Monroe
John R. Monroe
John Monroe Law, P.C.
156 Robert Jones Road
Dawsonville, GA  30534
(678) 362-7650
jrm@johnmonroelaw.com
Georgia State Bar No. 516193

/s/ Michael F. Smith
Michael F. Smith (P49472)
The Smith Appellate Law Firm
1717 Pennsylvania Ave. NW, Ste 1025
Washington, DC  20006
(202) 454-2860
smith@smithpllc.com

Michigan Office:
24405 Gratiot Ave.
Eastpointe, MI  48021

**Attorneys for Plaintiff**