UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **C.S.,** *by her next friend,* **ADAM STROUB,** | **2:22-CV-10993-TGB-EAS** |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER RESOLVING CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| **CRAIG MCCRUMB,** *et al.*, | |
| Defendants. | **(ECF NOS. 15 & 17)** |

In February 2022, Robert Kerr Elementary School, located in Durand, Michigan, held an event for students called "Wear a Hat" Day. School officials noticed that one of their young students, a third-grade girl, was wearing a black, baseball-style cap embroidered with a white star, an AR-15 assault rifle, and the slogan "COME AND TAKE IT." After they asked the student to put the hat in her locker, and because she was not allowed to wear it, her father Adam Stroud filed this lawsuit on her behalf. Because she is a minor, C.S. is identified only by her initials. The complaint filed on her behalf asserts that the school's refusal to let C.S. wear the hat violated her rights under the First and Fourteenth Amendments. *See* 42 U.S.C. § 1983.

Both parties have asked the Court to enter summary judgment in their favor. The Court held a hearing on their motions on January 23, 2024. For the reasons below, C.S.'s motion will be **DENIED**, and Defendants' motion will be **GRANTED.**

1

## I.   BACKGROUND

On February 17, 2022, C.S. wore a hat with an AR-15 and the slogan "COME AND TAKE IT" embroidered on it to her third-grade class at Robert Kerr Elementary School. Papanek Dep., ECF No. 15-2, PageID.251. According to her mother, C.S. had given the hat to her father, Adam Stroub, as a birthday present. Linfield Dep., ECF No. 17-6, PageID.385. Before going to school that morning, C.S. selected it from a pile of hats and asked if she could wear it. Her mother said, "Yes." *Id.* The image of the hat below was included in the complaint.



Robert Kerr Elementary School has a dress code that generally prohibits students from wearing hats during school hours, except

outdoors for recess. Student Handbook, ECF No. 15-2, PageID.231. The
Student Handbook provides:

> We want to be sure our students are safe and do not distract
> from the learning atmosphere of the classroom. Below you will
> find our school dress code. We may call home for a change if
> your child's clothing does not meet this code.
>
> -Skirt/dress length – at fingertips with arms extended down
> -Shorts – at fingertips with arms extended down
> -Shirts – cover the shoulders, no large armholes, and no bare
> midriffs
> -Pants – all pants should fit appropriately to cover under
> garments
> - Shoes – **No flip-flops**, tennis shoes (required for PE and
> without high heels), no HIGH HEELS AT ALL
> -Make-Up – Not for any elementary child, please
> **-Hats/head scarves are not worn by boys or girls during
> school hours, except for recess outdoors.**
> -No pajamas worn at school (unless school sponsored event)
> **-Anything printed on clothing must not be offensive in
> any way. The building principal/staff has the right to
> decide what is offensive, but some examples are:
> words/slogans that advertise illegal substances,
> words/slogans that are racially or religiously offensive,
> violence themes, vulgar or sexual innuendo, etc.**

*Id.* (emphasis on shoes provision in original but otherwise added).

But February 17, 2022 was "Wear a Hat" Day, so hat-wearing was
encouraged. It was part of a program that encouraged different dress-up
options for each day of the week as part of Robert Kerr's "Great Kindness
Challenge," a week-long event focusing on "the difference a culture of
kindness and compassion … [could] make." "RK Locomotion" Newsletter,
ECF No. 17-9, PageID.418-19. "Wear a Hat" Day stood alongside other

3

dress-up days, such as "Wear Red, Pink, or Hearts!" Day, "Mix It Up" Day, "Wear Neon Colors, Sparkles, or Sunglasses!" Day, and "Wear Blue and White" Day. *Id.* In connection with the "Great Kindness Challenge," students were also given "Great Kindness Challenge" checklists, which they could complete to receive a small prize. *Id.*

C.S.'s locker was across the hall from the office of Michael Papanek, the school's behavioral specialist. Papanek Dep., ECF No. 15-2, PageID.251-52. Papanek testified that students often stopped by his office to say "hi." *Id.* at PageID.250-51. That morning, C.S. did just that and, during their brief exchange, Papanek noticed her hat. *Id.* at PageID.251-52.

At that point, Papanek said nothing to C.S. about the hat, and she went to class. *Id.* at PageID.252. But he was concerned that the hat could be a violation of the dress code and went to the office of the principal, Amy Leffel, to seek guidance. *Id.* at PageID.253; Leffel Dep., ECF No. 15-2, PageID.191-92. The part of the dress code that concerned him was the prohibition on "offensive" clothing. Papanek Dep., ECF No. 15-3, PageID.253. Superintendent Craig McCrumb happened to be in Leffel's office that morning for unrelated reasons. McCrumb observed the conversation between Leffel and Papanek but did not contribute to it. McCrumb Dep., ECF No. 15-2, PageID.125.

Papanek and Leffel later recalled that the "Wear a Hat" Day incident with C.S. was the first time they dealt with a possible dress code

violation involving the depiction of a weapon. Leffel Dep., ECF No. 15-2, PageID.200-03; Papanek Dep., ECF No. 15-2, PageID.261. On hearing Papanek's description of the hat, Leffel determined that it was not school-appropriate for three separate reasons.

*First,* Leffel concluded that the hat violated the dress code's prohibition on "violence themes" because it depicted a weapon. As Leffel later explained during a deposition:

> Well, it has a weapon on it, and the phrase, "Come and take it." I took that as threatening. The phrase itself seems like it's trying to incite someone to come and have an altercation to take the weapon. … [W]e're in an elementary school setting and it is a gun-free zone. And I didn't feel that any type of weapons are appropriate in the school setting or anything that suggests violence. Guns often suggest violence.

Leffel Dep., ECF No. 15-2, PageID.196-97. Leffel interpreted the code broadly as prohibiting "violence, vulgar language, for example, beer logos or slang statements, things that would not be appropriate … for a school setting," but staff and students could wear "anything that doesn't have … vulgar wording, inappropriate pictures, logos not appropriate for school." *Id.* at PageID.189. The Handbook provided that enforcement of the code was "at the principal's discretion;" Leffel generally applied it when confronted with "anything that incites—has violent themes or can incite violence or disrupt the educational setting." *Id.* at PageID.197. From her perspective, "there is no … pictures of weapons that would be appropriate in the school setting at any time." *Id.* at PageID.203.

5

*Second*, because young elementary school students can be "impetuous," Leffel was concerned that some students would interpret the "Come and Take It" slogan on the hat as a dare to *literally* try to come and take the hat from its wearer. *Id.* at PageID.206. As she explained, "[W]e strive to teach kindness to our kids. And making a declarative statement, 'Come and take it,' is often—I interpreted it as inciting an altercation or could incite an altercation." *Id.* at PageID.203.

*Finally*, Leffel worried that the imagery on the hat could disrupt the learning environment at Robert Kerr Elementary because some of its students recently transferred from the Oxford school district—where a mass school shooting at Oxford High School on November 30, 2021 claimed the lives of four people and wounded seven others. *Id.* at PageID.205. As Leffel explained at her deposition, she believed a depiction of a gun could cause fear and disrupt the classroom environment—particularly if tests were being administered:

> Well, other than the—we have students that attended— attended Robert Kerr that had moved from Oxford. And I had several conversations with their parents. And those students were receiving counseling and social work support to deal with the trauma. And so … with all the school shootings we have, it's a picture of an automatic weapon. … I think [wearing the hat] would—could disrupt the educational environment. So anything that is involved in that from class work, if they're taking a test that day, it could have impacted it if kids were uncomfortable.

*Id.* at PageID.205-07.

6

With these concerns in mind, Leffel asked Papanek to contact C.S.'s parents and see whether they were able and willing to bring a replacement hat for C.S. to wear. *Id.* at PageID.191.

Following Leffel's instructions, Papanek called C.S.'s parents to ask if they were willing to bring another hat. Papanek Dep., ECF No. 15-2, PageID.256. Stroub said no. *Id.* at PageID.257. Neither he nor Papanek remember the exact details of their exchange. Stroub recalls he told Papanek that C.S. chose to wear the hat, she has the right to wear the hat, and the "hat's not hurting anybody." Stroub Dep., ECF No. 15-2, PageID.153. According to Papanek, Stroub told him "at least a couple" more things, including something to the effect that "no one better lay a hand on her hat" and that "the 1st Amendment does not end at the schoolhouse gates." Papanek Dep., ECF No. 15-3,PageID.257.

When Leffel learned from Papanek that Stroub was not going to bring another hat, she tried to contact him herself and then went with Papanek to C.S.'s classroom. Leffel Dep., ECF No. 15-2, PageID.193. The two briefly took C.S. out of class. *Id.* Leffel told her that she "hadn't done anything wrong, it's just her hat with a picture on it isn't something that's appropriate for school." *Id.* Papanek and Leffel asked C.S. if she would put the hat in her locker. *Id.*; Papanek Dep., ECF No. 15-2, PageID.258. According to Papanek, C.S. was "receptive" to the request, complied with it, and returned to class. She was not disciplined, and no one spoke to her about the hat again. *Id.* at PageID.259; Leffel Dep., ECF No. 15-2,

PageID.193. Later that day, C.S.'s teacher told Leffel she was concerned about the hat when she saw it and also didn't believe it was appropriate. Leffel Dep., ECF No. 15-2, PageID.206.

In the afternoon, Stroub emailed the following note to Leffel: "So I'm told you guys made [C.S.] put her hat in her locker after we spoke; is that true?" *Id.* at PageID.194. Leffel responded:

> Yes, we requested that [C.S.] put her hat in her locker, which she did. She was not upset or disturbed and happily went on with her day. I called you at 11:03 am to discuss this with you further and left a message. Mr. Papanek did report that he had called you and related your concerns to me. I addressed those in my voicemail but will address them again[.]
>
> I respectfully appreciate your individual rights as a citizen, however, those do not supercede [sic] school rules. Our handbook states that "we want to be sure our students are safe and do not distract from the learning atmosphere of the classroom." The hat in question had a picture of an AR type weapon on the front of it. Weapons of any kind are not appropriate for students to wear in a school setting.
>
> I have also included Mr. McCrumb in this email as he was present when I addressed this earlier today. I understand that you might not agree with me regarding this issue, and I respect your opinion. However, it is my responsibility as principal, to provide an appropriate learning environment for our students. Thank you for reaching out.

Email, ECF No. 15-2, PageID.115.

C.S.'s parents did not raise the issue again or make any effort to discuss the incident with the school. Stroub Dep., ECF No. 15-2, PageID.155. Three months later, however, Stroub filed this lawsuit on

C.S.'s behalf, asserting that Leffel, Papanek, and McCrumb violated her rights under the First and Fourteenth Amendments when they told her she could not wear the hat. ECF No. 1. His complaint seeks: (1) a declaration that C.S.'s act of wearing the hat is protected speech and may not be restricted; (2) an injunction prohibiting the school from restricting C.S. from wearing the hat; (3) nominal damages; and (4) attorney fees.

C.S. testified at a deposition that she picked the hat because it was her dad's and "made [her] feel safe." C.S. Dep., ECF No. 15-2, PageID.111. In a later declaration, she also swore that she "enjoy[s] shooting rifles with [her] father" and wore the hat "to hat day … because it shows [her] support for the right of people to have guns." C.S. Declaration, ECF No. 20-1, PageID.501.

C.S.'s parents, Linfield and Stroub, maintain that C.S. came home very upset over the incident. Stroub Dep., ECF No. 15-2, PageID.155; Linfield Dep., ECF No. 17-6, PageID.387. Stroub insists that nothing about the hat could be seen as having a violent theme because the star and the "Come and Take It" slogan are well-known from several historical events:  the ancient Battle of Thermopylae in 480 B.C., a 1778 battle between the British and Americans in Georgia, the Texas Revolution, and the United States Special Operations Command Central slogan. Stroub Dep., ECF No. 15-2, PageID.160-72. He says that C.S. has since asked for other clothing showing her support for the Second Amendment, but he has not granted those requests because this incident reflected that

9

she would not be allowed to wear such clothing at school and the family cannot afford clothes C.S. cannot wear daily to school. *Id.* at PageID.172.

According to Stroub, C.S. attends a yearly Second Amendment rights rally in Lansing with him, and the two shoot guns together as a recreational activity. *Id.* at PageID.160. He acknowledges that C.S. owns no guns, has never taken a gun safety course, and has never written any school essays expressing her opinions about the Second Amendment. *Id.* at PageID.161. He further acknowledges that he has never discussed the dress code policy with any school officials. *Id.* at PageID.155.

Since the incident, the school has not revised its dress code policy, but it has added a "Freedom of Expression" section to its handbook. Klont Dep., ECF No. 15-2, PageID.273. According to the new principal, Tanya Klont, this new section says that students have the right to express themselves, but they need to do it responsibly and appropriately. Material cannot be displayed if it is obscene, libelous, indecent, vulgar, advertises products or services not permitted to minors by law, or if it is insulting or harassing or intends to incite a fight or causes disruption at school. *Id.* Klont testified that, even under the new policy, the hat would not be acceptable.

*First*, Klont believed that the gun could be interpreted as a sign of violence, especially given the proximity of the Oxford school shooting:

> I think mainly it would be objectionable because it has a gun. And we are trying to teach kids how to be peaceful. And I just think that having a gun with school shooting going on I had

10

> to deal with a lot of kids with anxiety last year over school
> shootings after Oxford, I just think it would make students
> uncomfortable.

*Id.* at PageID.175.

*Second*, Klont shared Leffel's concerns that elementary students

might not understand the "Come and Take It" slogan:

> I just—not sure if elementary schools would know—kids,
> sorry—would know how to interpret it, like, "Come and take
> it," like "come and take this hat" or "come and take my gun."
> I don't know if they would understand what that would mean.

*Id.* at PageID.274-75.

With discovery now complete, the parties have filed cross motions

for summary judgment.

## II.   LEGAL STANDARDS

"The fact that the parties have filed cross-motions for summary

judgment does not mean … that summary judgment for one side or the

other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437,

441 (6th Cir. 2003). Instead, the Court must apply the well-recognized

summary-judgment standard in evaluating both motions.

A party is entitled to summary judgment if it "shows that there is

no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute

exists if "the record taken as a whole could not lead a rational trier of fact

11

to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

At summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986). But that party "must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## III. DISCUSSION

C.S.'s father argues that C.S.'s act of wearing the hat was akin to "pure speech." Urging that the record lacks sufficient evidence from which school officials could reasonably forecast that the hat would lead to material and substantial disruption of school activities, he argues that the school violated C.S.'s First Amendment rights by barring her from wearing it. ECF No. 15-1, PageID.92-100.

Defendants disagree that the act of wearing the hat was pure speech. ECF No. 17, PageID.300. They continue that, because C.S. wore the hat during a school-sponsored event, they were entitled to exercise control over its contents. *Id.* at PageID.303. To the extent they could not, they urge that there is enough evidence showing that the hat could work a substantial disruption on classroom activities. *Id.* at PageID.304-06.

A summary of the seminal cases necessary to understand these arguments and the standards of review they invoke follows.

## A. Supreme Court Cases

The Supreme Court has held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Nonetheless, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). A student's right to free speech must be balanced against the need for school officials "to maintain the discipline and learning environment necessary to accomplish the school's educational mission." *Barr v. Lafon*, 538 F.3d 554, 562 (6th Cir. 2008).

A trilogy of Supreme Court cases establishes the framework governing student speech.

The first case, *Tinker*, concerns high school and junior high students who were suspended for wearing black armbands to school to express opposition to the Vietnam War. 393 U.S. at 504. The Supreme Court concluded that, under the circumstances (which included the students, their parents, and several community members discussing that they would voice their opposition to the war by wearing the armbands), the wearing of armbands to oppose a war was "closely akin to 'pure speech,'" and was therefore entitled to comprehensive First Amendment

13

protection. *Id.* at 505-06. According to the Court, the armbands were "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance," and there was no evidence in the record that the students had interfered "with the schools' work or of collision with the rights of other students to be secure and to be let alone." *Id.* at 508. While the "variation from the majority's opinion" could cause discomfort, "undifferentiated fear or apprehension of disturbance [was] not enough to overcome the right to freedom of expression." *Id.*

C.S.'s father asks this Court to apply the standard announced in *Tinker* to her act of wearing a hat depicting an AR-15 and the slogan "COME AND TAKE IT." Under this standard, "for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint … [there must be a] showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Id.* at 509 (citations omitted).

While *Tinker* remains good law, in two later cases, the Supreme Court elaborated that—depending on the circumstances in which student speech occurs—restrictions on it need not always be accompanied by a showing that the speech could materially and substantially interfere with the requirements of appropriate discipline in a school.

In *Bethel School District No. 403 v. Fraser*, the Court considered a case where a public high school student had given a speech at a school-sponsored assembly in support of another student's candidacy for a student-body office and referred to that student candidate with "an elaborate, graphic, and explicit sexual metaphor." 478 U.S. at 677-78. The school suspended the student for violating the school's policy prohibiting "[c]onduct which materially and substantially interferes with the educational process…, including the use of obscene, profane language or gestures." *Id.* The student challenged the suspension as a violation of his First Amendment rights.

The Court held that it did not follow from *Tinker* that the constitutional rights of students in public schools were automatically coextensive with the rights of adults in other settings. *Id.* at 682. Unlike the discipline imposed on the students in *Tinker*, there was no indication in *Fraser* that the suspension was motivated by or related to any political viewpoint. *Id.* at 685. With regard to enforcing a school policy prohibiting vulgar and lewd speech, the Court concluded that, because the use of such language would undermine the school's basic educational mission, the First Amendment did not prevent school officials from regulating it, and they were well within their power to prohibit it. *Id.*

In *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), meanwhile, the Supreme Court examined the First Amendment's application to the scope of a school administrator's authority to exercise

15

editorial control over the content of a school-sponsored newspaper. Student newspaper staff members sued the school after the principal deleted two pages of articles discussing student experiences with pregnancy and the impact of divorce on their classmates. *Id.* at 262-63. The principal explained that he deleted the pages because he was concerned that, although the articles used pseudonyms, the students might still be identifiable—and he also believed that the articles' references to sexual activity were inappropriate for the school's younger students. *Id.* at 263.

The Court determined that, because the school lent its name and resources to the paper, *Tinker* did not apply to regulating its contents. *Id.* at 271-73. It reasoned that, when student speech occurs as part of a curriculum, educators need latitude to ensure that students learn whatever lesson a particular activity is designed to teach, that students are not exposed to material inappropriate for their level of maturity, and that the views of individual students are not erroneously attributed to the school. *Id.* at 271-72. Accordingly, it held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Ultimately, the Court concluded that the principal did not violate the students' First Amendment rights in redacting their

16

publications because the principal reasonably related his editorial decisions to legitimate pedagogical concerns. *Id.* at 275-76.

The Sixth Circuit has interpreted this trilogy of cases as establishing three basic principles:

(1) Under *Fraser*, a school may categorically prohibit vulgar, lewd, indecent, or plainly offensive student speech;

(2) Under *Hazelwood*, a school has limited authority to censor school-sponsored student speech in a manner consistent with pedagogical concerns; and

(3) The *Tinker* standard applies to all other student speech and allows regulation only when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline.

*Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 332 (6th Cir. 2010) (citations and quotations omitted).

A fourth Supreme Court case, *Morse v. Frederick*, reiterates that "schools may regulate some speech even though the government could not censor similar speech outside the school" and that *Tinker* "is not the only basis for restricting student speech." 551 U.S. 393, 405-06 (2007) (quotations omitted). There, a high school principal suspended a student for refusing to take down a 14-foot banner with the phrase: "BONG HiTS 4 JESUS." *Id.* at 397-98. A majority of the Court agreed that the principal was justified in disciplining the student, though the Justices were divided over the reasons why. The narrow holding that emerged from *Morse* is that a public school may prohibit student speech at a school or at a school-

sponsored event during school hours that the school "reasonably view[s] as promoting illegal drug use." *Id.* at 403.

### B. Sixth Circuit Court Cases

Sixth Circuit case law establishes that, at a minimum, to invoke First Amendment protections, a student must show that her conduct is "imbued with elements of communication which convey a particularized message that will be understood by those who view it." *Blau v. Fort Thomas Public School Dist.*, 401 F.3d 381, 390 (6th Cir. 2005) (quotations and alterations omitted). Simply wanting to wear clothes that students believe "look nice" and reflect their middle-school individuality, for instance, does not trigger First Amendment protections. *Id.* at 389.

If a student can establish that her conduct was expressive and intended to convey some sort of message, a school may nonetheless regulate speech that is vulgar, plainly offensive, or inconsistent with its basic educational mission. *See Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470 (6th Cir. 2000). Under this framework, the Sixth Circuit approved a school's decision to ban as offensive a Marilyn Manson t-shirt despite arguments that the three-headed Jesus figure it depicted carried religious implications. *Id.* at 471.

The Sixth Circuit has not yet addressed student clothing featuring depictions of firearms, other lethal weapons, or Second Amendment-related slogans. It has, however, addressed school regulation of clothing featuring controversial images—and in particular, shirts depicting

18

Confederate flags, which students wanted to wear to express pride in their southern heritage. *See, e.g.*, *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010); *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008); *Castorina ex rel. Rewt v. Madison Cty. Sch. Bd.*, 246 F.3d 536 (6th Cir. 2001). In these cases, the Sixth Circuit found that the act of wearing such symbols is akin to "pure speech," and that the regulation of such speech is thus subject to *Tinker*'s rule. *Defoe*, 625 F.3d at 332; *Barr*, 538 F.3d at 564; *Castorina*, 246 F.3d at 540. In *Defoe* and *Barr,* two panels of the Sixth Circuit concluded that the schools adequately justified their restrictions on such clothing because the record showed evidence of racial unrest in the schools. In particular:

- In *Defoe*, there was uncontested evidence of racially charged graffiti, including slurs, a Swastika, comments about white power, and a hangman's noose; an incident where Oreo cookies were thrown onto a basketball court when a biracial basketball player attempted to warm up before a game; and several racially-charged altercations between students. *See* 625 F.3d at 334-35.

- In *Barr*, there was racist graffiti, fights between black and white students, hit lists containing student names, a fear-motivated increase in absenteeism among black students, and a school lockdown implemented because of a breakdown in student discipline and the threat of race-related violence. *See* 538 F.3d at 566-67.

In *Castorina*, however, the panel found insufficient evidence of racial tensions or a risk of substantial school disruption to justify a prohibition on a t-shirt with a Confederate flag on the back commemorating the birthday of country singer Hank Williams. 246 F.3d at 538. And although

the school maintained that its "anti-racist" dress code was viewpoint neutral, fact questions remained over whether the school enforced the policy in a way that targeted only certain viewpoints—for instance, there was evidence that, though the school banned the Confederate flag, it allowed clothing venerating Malcolm X. *Id.* at 541.

### C. Other Circuits

The Seventh Circuit recently considered a case that specifically addressed the question of Second Amendment-related speech by students. In *N.J. by Jacob v. Sonnabend*, 37 F.4th 412 (7th Cir. 2022), the reviewing panel was tasked with evaluating whether school officials violated the First Amendment rights of two teenagers who wanted to wear t-shirts expressing their support for the right to bear arms.

Ultimately, the panel came to no definite answer. Judge Diane Sykes, who authored the opinion, concluded only that the district judge had been misguided by a prior Seventh Circuit decision in his analysis and therefore erroneously applied the *Hazelwood* standard in concluding that barring the teenagers from wearing the shirts was constitutionally permissible. 37 F.4th at 425. Judge Sykes instructed that the situation instead should have been analyzed under *Tinker*, as the shirts were not "vulgar" within the meaning of *Fraser* and could not reasonably be considered to "bear the imprimatur of the school," like the newspaper in *Hazelwood*. The appeal of one of the students became moot because he graduated while it was pending. The reviewing panel vacated the

judgment as to the second and remanded the case to the district court to apply the *Tinker* standard in the first instance.

In providing guidance to the district judge on remand, Judge Sykes emphasized that, under *Tinker*, "mere speculation [of disruption] won't do, and there's no generalized 'hurt feelings' defense to a high school's violation of the First Amendment rights of its students." *Id.* at 426 (quotations and citations omitted). Nonetheless, Judge Sykes advised that "[t]he application of *Tinker* must account for such factors as the age and grade level of the students to whom the speech is directed and any factors particular to the educational environment or history of the school or student body in question." Additionally, "[t]emporal factors and recent events might be included." *Id.* Moreover, the analysis should "account[] for the professional knowledge and experience of school administrators in setting and enforcing disciplinary standards." *Id.*

(On remand, the district judge dismissed the case as moot because the second student graduated, so it is unknown how the district judge would have applied *Tinker* to the shirts in the first instance.)

### D. The Case at Bar

With this background, the Court turns to the parties' dispute over which standard—*Tinker*, *Hazelwood*, or something else entirely—applies to the school's decision to ask C.S. to put her hat in her locker.

C.S.'s father maintains that C.S.'s act of wearing the hat was "akin to pure speech" because—according to him—C.S. supports the Second

Amendment, and any reasonable person would understand the message on the hat as simply conveying support for the Second Amendment. ECF No. 15-1, PageID.92-100. In his view, *Tinker* governs. Urging that the record does not have sufficient evidence that school officials could reasonably forecast disruption of school-related activities based on the hat's AR-15 image and "COME AND TAKE IT" slogan, he argues that the decision to bar C.S. from wearing it violated the First Amendment. He contends that Principal Leffel's concerns about disruptions in the school based on the Oxford shooting were "minimal."

Robert Kerr officials, meanwhile, challenge whether the act of wearing that hat is conduct protected by the First Amendment at all. And even if it is, they contend, the *Hazelwood* standard governs because C.S. was only wearing the hat as part of "The Great Kindness Challenge," a school-sponsored event. ECF No. 17, PageID.303. Urging that other students, parents, and members of the public might perceive the hat as tacitly or explicitly approved by the school as part of the week-long event, school officials maintain that they were authorized to prohibit it because it was not conveying a message in line with the school's pedagogical mission of teaching children kindness.

The record is not well-developed as to the threshold question: whether C.S. herself wore the hat with the intention of conveying a message about her support for the Second Amendment—or any message at all. When Papanek and Leffel asked her to put the hat in her locker,

22

she made no mention of her interest in expressing an opinion about the Second Amendment. At her deposition, when asked why she wore the hat, she again did not mention the Second Amendment but said only that she chose the hat because it was her dad's and "made [her] feel safe." The Court acknowledges that, in a later declaration submitted by counsel, C.S. made a new sworn statement that she wore the hat "because it shows [her] support for the right of people to have guns." ECF No. 20-1, PageID.501. But courts generally do not permit litigants to use later-arriving declarations conflicting with earlier sworn testimony to manufacture fact disputes defeating summary judgment. *Moore v. Ohio River*, 960 F.2d 149 (Table), 1992 WL 78104, at *3 (6th Cir. 1992).

At oral argument, the Court noted this issue and asked C.S.'s counsel whether, for First Amendment protections to apply, a speaker needed to *intend* to convey a message—and if it mattered whether the speaker and her intended audience *understood* that the use of a particular symbol and language (here, the "COME AND TAKE IT" slogan, which C.S.'s father insists is well known and should be easily recognizable from the famous ancient Battle of Thermopylae) conveyed the intended message. Counsel initially dodged these questions, maintaining that the answers to them did not matter in the context of a "pure speech" case. This is not quite correct: the anti-war armbands in *Tinker* were protected by the First Amendment *because* they were intended and understood to convey a message.

23

When pressed further on the reality that any message C.S. was intending to convey about her support for the Second Amendment was being expressed exclusively through the use of a symbolic slogan, counsel responded that "what the speaker thought that the words and symbols meant is not really the determining factor" and "it doesn't matter what the audience understands." These responses suggest counsel believes that First Amendment protections apply even when a speaker does not intend to express any particular idea—and when the audience is not capable of understanding that any idea is being expressed. This cannot be correct. As the Sixth Circuit held in *Blau,* the threshold for invoking First Amendment protections is that a particular action or symbol is "imbued with elements of communication which convey a particularized message that will be understood by those who view it." *Blau*, 401 F.3d at 390 (quotations and alterations omitted).

As to the argument that the AR-15 rifle and the slogan on the hat should be treated as "pure speech," C.S.'s father further relies in his briefs on the Seventh Circuit's decision in *N.J.* to support his position. But nothing in *N.J.* addresses the issue of whether C.S. has presented sufficient evidence to establish that she was intending to convey a message by wearing the hat. And there are two problems with his reliance on *N.J.* to support his entitlement to judgment.

*First*, there are differences between the shirts there and the hat here. In *N.J.*, the shirts depicted below were the subject of the litigation.

 

Like C.S.'s cap, these t-shirts show images of firearms. One references "Wisconsin Carry, Inc." and the other pays tribute to the well-known firearms manufacturer "Smith & Wesson." But neither shirt features a message comparable to the commanding "COME AND TAKE IT" statement embroidered on C.S.'s hat.

*Second,* the students in *N.J.* were teenagers. C.S., by contrast, was in the third grade. While Judge Sykes ultimately concluded that *Tinker* governed the analysis in that case, as discussed above, she advised that application of *Tinker* must "account for such factors such as the age and grade level of the students to whom the speech is directed and any factors particular to the educational environment or history of the school or student body in question." 37 F.4th at 426. There is no dispute here that C.S. was an elementary school student. The age difference is significant.

C.S.'s father also points to a decision from a district court in the Seventh Circuit which preceded *N.J.* by a few years, *Schoenecker v. Koopman*, 349 F. Supp. 3d 745 (E.D. Wis. 2018). That decision, also involving a high school student, granted a motion for a preliminary injunction to prevent the school from prohibiting the student from wearing shirts like the following:



In *Schoenecker*, Judge Lynn Adelman—to whom the case was assigned—agreed with the student plaintiff that the act of wearing these shirts was protected under the First Amendment as pure speech. *Id.* at 752. He acknowledged that there was evidence in the record that the school had experienced some disruptions because of the shirts: news media came to the school to conduct interviews about them; arguments had erupted between students because of the shirts; and teachers had expressed discomfort because of the recent occurrence of the Parkland shooting in Florida. But he saw no indication that the shirts themselves disrupted any teacher's ability to provide instruction or promoted gun violence. *Id.*

at 753. Nor was there evidence of "a threat of a decline in test scores, an upsurge in truancy, or other symptoms of a sick school." *Id.*

But again, *Schoenecker* does not address the question of whether some evidence should be required to show that a student's act of wearing clothing is intended to convey a protected form of speech; it appears that there was no question in that case that a pro-Second Amendment or pro-gun message was intended and expressed. And reliance on the decision is also problematic because it is in the wrong posture to dictate the outcome of this case. The Court here is tasked with determining, on the merits, whether there exists a fact question requiring the case to go to a jury—not with determining whether the plaintiff has made an adequate showing that she is likely to succeed on the merits at a later point in time.

Additionally, *Schoenecker* was a Wisconsin case where students and staff expressed discomfort and fear over the Parkland shooting in Florida. Here, by contrast, the school shooting in Oxford, Michigan was more immediate and occurred in the same state. Indeed, there is evidence in the record that students from the Oxford district where the shooting happened had transferred to C.S.'s district. Of course, the parties do not provide extensive details about the Oxford shooting in the record for this case. But the Court is not required to ignore the reality of that event—in which a firearm was used to take the lives of four high school students and severely injure seven other people, including a teacher. This tragedy

has caused lasting scars on Michigan schools, and its impact is still felt acutely state-wide.[1]

Assuming that—in spite of the poorly-developed state of the record—C.S. has submitted sufficient evidence to show that she *intended* to wear the hat to convey a protected message about her opinions on the Second Amendment (not merely as a comfort object or a statement of her individuality), the Court concludes that C.S. has failed to raise a genuine issue of material fact that a jury would need to decide. Rather, the undisputed facts in the record support entry of summary judgment in favor of the school officials.

*Fraser* is inapplicable here because nothing about the hat can be considered "plainly offensive," like the explicit and vulgar speech made to the student body by the student in that case. And the Court does not necessarily agree with school officials that the act of wearing a hat with a certain message during "Hat Day" should be considered school-sponsored speech, such that school administrators had heightened control over its contents. The wearing of particular hats on "Hat Day"

---

[1] For an account, *see What We Know About the Michigan High School Shooting*, NYT (Dec. 9, 2021), https://www.nytimes.com/article/oxford-school-shooting-michigan.html. Indeed, on the day the Court held oral argument in this case, the criminal trial for one of the parents of the shooter commenced. *See Michigan School Shooter's Mother to Stand Trial for Manslaughter in 4 Student Deaths*, U.S. News (Jan. 23, 2024), https://www.usnews.com/news/best-states/michigan/articles/2024-01-23/michigan-school-shooters-mother-to-stand-trial-for-manslaughter-in-4-student-deaths.

does not appear to entail the kind of expression that a reasonable observer would be likely to view as carrying "the imprimatur of the school," like the newspapers at issue in *Hazelwood*. This is so despite Defendants' observations at the hearing that—since the school generally prohibited hats—a passerby might be surprised to see a student leaving school wearing a hat. The Court therefore concludes that the standard set out in *Tinker* must govern. But the analysis does not end there.

As *Tinker* holds and C.S.'s father has observed, the First Amendment does not end at the doors of a schoolhouse. Yet its protections must be "*applied in light of the special characteristics of the school environment.*" *Tinker*, 393 U.S. at 506 (emphasis added). "That the First Amendment protects speech in the public square does not mean it gives students the right to express themselves however, whenever and about whatever they wish." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012).

Teachers and administrators may not force students to "utter what is not in [their] mind," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943), or to be silent about their opinions when expression of those opinions does not disrupt the learning environment, *Tinker*, 393 U.S. at 509. For these reasons, schools may not expel students who refuse to recite the Pledge of Allegiance, *Barnette*, 319 U.S. at 642, or prohibit students from wearing black armbands to signal protest against the Vietnam War when there is no evidence that the armbands could cause disruption to the educational goals of the school, *Tinker*, 393 U.S. at 509.

By the same token, however, teachers and administrators must have latitude to further legitimate pedagogical goals and account for the "level of maturity" of the students whom they teach. *Hazelwood*, 484 U.S. at 271. They can, for instance, reject proposed topics for essays when they reasonably determine those topics defeat the learning goals of the assignment, *Settle v. Dickson Cty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995), refuse to allow a student to wear a Marilyn Manson shirt, *Boroff*, 220 F.3d at 470, and censor student publications when they reasonably believe that the content of those publications is ill-suited to the maturity level of the student body population, *Hazelwood*, 484 U.S. at 271.

Here, the record is undisputed that school officials at Robert Kerr Elementary School made the decision to prohibit clothing featuring "violence themes," interpreted as depictions of any sort of weapons, because they teach elementary school students, and they believed such depictions could work disruptions in the school environment. Facially, this dress code regulation is viewpoint-neutral and does not target slogans, symbols, or language intending to convey support for the Second Amendment; as Robert Kerr officials have interpreted it, the regulation simply bans all depictions of weapons and violent themes. There is no evidence in the record, as there was in *Castorina*, that the school applied this regulation selectively or in a manner that singled out students based on disagreement with their political beliefs—or that the proffered justification for the regulation was somehow pretextual. To the extent

that C.S.'s father attempts to suggest that the regulation is ambiguous because it could be interpreted to ban Michigan's seal (which, for those who have not carefully examined it, depicts among other things a hunter with a long gun) or hunting t-shirts, he has not offered evidence that the school has previously allowed clothing with such imagery.

Moreover, school administrators presented undisputed evidence supporting their professional judgment that allowing students to wear clothing featuring images of firearms—especially assault-style rifles—carries a substantial risk of disruption, and that C.S.'s hat with its "COME AND TAKE IT" slogan in particular caused a risk of scuffles.

*First*, because of the maturity level of elementary school students, teachers and administrators worried that the slogan carried a risk of inciting fights because younger students might misinterpret it as an invitation or a dare to actually come try to take the hat. As Judge Sykes noted in *N.J.*, a *Tinker* analysis should "account for such factors as the age and grade level of the students to whom the speech is directed." 37 F.4th at 426. And it should incorporate "the professional knowledge and experience of school administrators." *Id.* The Court sees no reason to question the judgment of school administrators here—informed by many years of experience with elementary school students—that the slogan carried with it a not-insignificant risk of classroom disruption. This is especially so because C.S.'s father has presented no evidence that would call this judgment into question.

*Second*, both former principal Leffel and current principal Klont testified that, after the Oxford shooting, several students from the Oxford district transferred to Robert Kerr Elementary. Since transferring, those students have been receiving counseling and other services to mitigate trauma from being in proximity to the Oxford shooting. In combination with the maturity level of the elementary students dealing with this lasting trauma, administrators' worries of classroom disruption, distraction, and the undermining of teaching goals here amount to more than simple discomfort with an unpopular viewpoint. Leffel, in particular, worried that seeing a depiction of an AR-15 in a classroom could work a disruption by distracting students during tests. As *N.J.* advises, "temporal factors and recent events" should be considered in evaluating whether school administrators *reasonably* anticipated that particular imagery risked creating a substantial interference in the work of the school. At the time that C.S. wore this hat, the Oxford shooting was very close in both time and space.

The Court has considered C.S.'s father's position that the concerns of administrators were "minimal" because there is no evidence that any disruption has yet occurred at Robert Kerr Elementary on account of school-shooting-related fear. As the Sixth Circuit explained in *Defoe*, however, "such an argument misapplies the *Tinker* standard because *Tinker* does not require disruption to have actually occurred. Instead, the Court evaluates the circumstances to determine whether the school's

forecast of substantial disruption was reasonable." 625 F.3d at 333 (quotations and citations omitted). To be sure, the record does not contain evidence of the volume of tension and hostility present in *Defoe*. But this case concerns students who are far younger: Robert Kerr Elementary is a school for students in the second to the fifth grades. These students are less mature and capable of reigning in emotional outbursts than junior high or high schoolers. And given that some of these students were actively receiving counseling for shooting-related trauma, the administrative decision to interpret the dress code to prohibit depictions of weapons that could trigger emotional and fear-based responses was reasonably related to the legitimate pedagogical objective of preventing school and classroom disturbances before they occurred.

The Court recognizes that C.S.'s father disagrees with this judgment call by Robert Kerr officials—and strongly so. He has the indisputable right to do so and hold his own beliefs. But C.S.'s father does not have the responsibility to maintain discipline and prevent disruption in an elementary school. Because he offers no evidence showing that administrators were applying their regulations in a selective matter or presented any countervailing proof that would call into question the reasonableness of their predictions, he has not succeeded in assembling a factual record that would support C.S.'s entitlement to judgment or in creating a fact dispute that would defeat the school's.

33

One final note. At oral argument, C.S.'s counsel changed the scope of the injunction originally requested—which was for an order to allow C.S. to wear her hat—to an injunction forcing school officials to allow students to wear any clothing depicting weapons in a "non-violent, non-threatening" manner. Even if C.S. had offered sufficient evidence to establish a violation of her constitutional rights, such an injunction would suffer from vagueness that would make it unenforceable. Someone would need to stand in judgment of what sort of weapons depictions were "non-violent" and "non-threatening" and which ones were not. The dispute in this case, which entails a parent disagreeing with school officials that his daughter's hat contained a "violence theme," illustrates the difficulty of the injunctive relief proposed. Absent evidence of viewpoint discrimination not present here, such decisions are best left to school officials, who have experience and training in such matters.

To the extent that the school officials rely in any way on qualified immunity to insulate their conduct, that doctrine would protect them from any monetary damages sought because elementary school students have no clearly established right to wear clothing depicting weapons.

## IV.   CONCLUSION

For the reasons above, C.S.'s motion for summary judgment (ECF No. 15) is hereby **DENIED**, Defendants' motion (ECF No. 17) is **GRANTED**, and judgment will enter in Defendants' favor.

C.S. is now in the fifth grade. Next year, she is bound for middle school. In reaching the conclusion that it does, the Court does not question C.S.'s sincere support for the Second Amendment, or her right to express that support. But under First Amendment case law, school administrators may place reasonable regulations governing the manner of that expression while she is in the school setting if reasonably necessary to avoid disruptions of the teaching and learning process in light of the age of the students and the context of recent experiences.

It may very well be that, in school settings with older students, the rules will allow her greater latitude to express her opinions through clothing. But here, Robert Kerr Elementary school officials made a policy decision to prohibit the wearing of a hat with an AR-15 and the phrase "Come and Take It" based on the written requirements of the student handbook and out of concern that the violence associated with an assault rifle and the aggressive nature of the slogan would be disruptive to the teaching atmosphere. The decision was justified by undisputed evidence in the record and therefore does not violate the First Amendment.

**SO ORDERED**, this 30th day of March, 2024.

BY THE COURT:


/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

35